THE CELOTEX CORPORATION, Petitioner, *v.* THE POLLUTION
CONTROL BOARD *et al.*, Respondents.

Third District    No. 81-10

Opinion filed September 29, 1981.

John L. Parker, of John L. Parker & Associates, Ltd., of Chicago, and H. Gerald Reynolds, of Tampa, Florida, for petitioner.

Tyrone C. Fahner, Attorney General, of Chicago (Douglas P. Karp, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE STOUDER delivered the opinion of the court:

This is a petition for direct review, pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1041), of a decision of the Illinois Pollution Control Board (hereinafter the Board). That decision affirmed the Illinois Environmental Protection Agency's (hereinafter the Agency) denial of an application for renewal of an

operating permit submitted by The Celotex Corporation (hereinafter Celotex).

Celotex owns and operates a dry roofing felt plant in Peoria. The plant includes two industrial coal-fired boilers for generating steam for process heating and electricity needed to operate the facility. Flue gases from both boilers pass through dust collectors and discharge through a common stack.

The Celotex operation remains the same as in 1975, when an operating permit was denied on the basis of potential violation of the sulfur dioxide emission standard of Air Pollution Rule 204 (c)(1)(A) (Ill. P.C.B. Rules and Regs., ch. 2, Rule 204(c)(1)(A)) (hereinafter Rule 204). As the rule had been invalidated, the Agency and Board were ordered to issue an operating permit for 120 days to permit Celotex to file a new petition. (*Celotex Corp. v. Pollution Control Board* (1977), 53 Ill. App. 3d 662, 368 N.E.2d 1134.) Prior to the expiration of that period, Celotex applied for renewal of its permit. The renewal permit application stated that the previously permitted operation had not been modified. The denial of the application is the subject of this proceeding.

The Agency's permit denial was once again based on the invalidated Rule 204. The denial was also based on the particulate emission standards of Air Pollution Rule 203 (g)(1)(B) (Ill. P.C.B. Rules and Regs., ch. 2, Rule 203 (g)(1)(B)) (hereinafter Rule 203), the visual emission standards of Air Pollution Rule 202 (b) (Ill. P.C.B. Rules and Regs., ch. 2, Rule 202 (b)) (hereinafter Rule 202 (b)), informational requirements of Air Pollution Rule 103 (b)(3) (Ill. P.C.B. Rules and Regs., ch. 2, Rule 103 (b)(3)) (hereinafter Rule 103 (b)(3)). The Board reversed the Agency denial as to the two former rule violations on the basis that the rules had been invalidated; however, the denial was affirmed because of violations of the latter two rules.

On appeal, Celotex presents seven issues for review; however, we shall address only two of these questions. The first is whether the corporation supplied all necessary information under Rule 103(b)(3); the second, whether the Board improperly relied upon Rule 202(b). The Agency presents the additional issue of whether the permit was properly denied on the basis of alleged potential violations of Rules 203 and 204. As Celotex raises no objection on grounds of estoppel or procedure, we shall address the merits of this question as well.

The first of the three issues we today address is whether Celotex supplied all necessary information under Rule 103(b)(3). The rule provides, *inter alia*:

> "(3) Application. An application for an Operating Permit shall contain, as a minimum, the data and information specified in paragraph (a)(2) of this Rule 103. * * * To the extent that the

above specified data and information has previously been submitted to the Agency pursuant to this Rule 103, the data and information need not be resubmitted; provided, however, that the applicant must certify that the data and information previously submitted remains true, correct and current."

In response to the Celotex application for renewal of an operating permit, which certified that the data and information previously submitted remained true, correct, and current, the Agency requested various information regarding Celotex's coal, fly ash reinjection units, and waste material disposition. Celotex responded that as the information had been previously submitted in support of an operating permit which was granted, and as the operation had not been modified, its given certification of current accuracy fulfilled the rule's requirements.

Although Celotex ultimately supplied additional information regarding its coal, the Board agreed with the Agency that the failure to supply all of the requested information was fatal to the Celotex petition. While numerous arguments have been advanced in support of this ruling, the essential bases are that the previously submitted information is not current information and that the Rule 202(b) violation indicates the information lacks current accuracy. We shall address the initial argument presently and the latter argument in conjunction with the second issue herein.

■■ We well recognize the Agency's need for data and information which are current and accurate. Without this empirical base, it would be impossible to determine whether a permit application has met its burden of proving compliance with statutory and regulatory standards. In order to obviate the necessity of resubmitting this empirical base, the Board has, by rule, provided that this is unnecessary when the information remains true, correct, and current. Celotex has certified that this is the case. The Board and Agency apparently suspect this certification was made in bad faith because resubmitting unchanged data and certifying prior data as current yield the same result. This being the case, the Agency is precluded by Rule 103(b)(3) from denying the permit because Celotex did not acquiesce to its request for current information.

The second issue we shall address is whether the Board improperly relied on Rule 202(b). The rule provides, *inter alia*:

"Rule 202(b) Visual Emission Standards and Limitations for All Other Emission Sources.

No person shall cause or allow the emission of smoke or other particulate matter from any other emission source into the atmosphere of an opacity greater than 30 percent."

Jewell B. Holleyman, a physical scientist employed by the United States Environmental Protection Agency (hereinafter USPEA), determined that Celotex had thrice violated this visual emission standard. While the

corporation questioned this determination, it proffered no contrary evidence; rather, it contended the Board's reliance was improper because Rules 203 and 204 have been invalidated.

In *Commonwealth Edison Co. v. Pollution Control Board* (1974), 25 Ill. App. 3d 271, 323 N.E.2d 84, *aff'd in relevant part* (1976), 62 Ill. 2d 494, 343 N.E.2d 459, the court concluded that the above two rules were not promulgated in accordance with law and must be viewed as arbitrary and unreasonable. The court explained:

> "From our reading of the record, we are unable to state that the Board took into account the technical feasibility of these rules.
> * * *
> *We further hold that there is no evidence that the Board took into account the economic reasonableness of these rules* for a substantial number of the generating units in this State. The testimony at the hearings indicated the cost of the sulfur removal systems would be great. Rather than presenting a formula indicating a balance between cost and pollution control or giving some concrete cost projections, the Board in its opinion offered general statements that there must be a 'balancing [of] the benefits of the contemplated rule against its costs' and that greater costs may be needed to be absorbed 'when the need for pollution abatement is greater.' " (Emphasis added.) *Commonwealth Edison Co. v. Pollution Control Board* (1974), 25 Ill. App. 3d 271, 287-88, 343 N.E.2d 84, 95-96, *aff'd in relevant part* (1976), 62 Ill. 2d 494, 343 N.E.2d 459.

The importance of the above further holding stems from the unique interrelationship of Rules 202(b) and 203. While we do not reach the question of whether this remains true, compliance with Rule 203 was at least a defense to noncompliance with Rule 202(b) (see Ill. P.C.B. Rules and Regs., ch. 2, Rule 203(c)) before Rule 203 was invalidated. More directly in point is the additional interrelationship noted by the Board when the regulations were promulgated:

> "Rule 202: Visual Emission Standards: Standards based upon the visual appearance of an emission are long-standing, familiar, and relatively unsophisticated.
> * * *
> The numerical standard for opacity, 40% in the APCB regulations, has been lowered for most sources to 30% on the basis of Agency evidence (R. 30, 31, 496, 501) that this level will generally be achieved or bettered by facilities complying with the numerical standards for particulate matter in Rule 203. *Since we have found compliance with the latter economically reasonable, it follows that*

*the corresponding opacity standard is reasonable too.*" (Emphasis added.) *In re Emission Standards* (1972), 4 P.C.B. 298, 309-10.

■■ We are thus faced with a situation where the economic reasonableness of Rule 202 was apparently never directly considered but rather solely judged on the economic reasonableness of Rule 203. Under these circumstances we are constrained to conclude the enactment of Rule 202 must be similarly held to be void. (Contra, *United States Steel Corp. v. Pollution Control Board* (1978), 64 Ill. App. 3d 34, 380 N.E.2d 909.) On remand, the Board may validate the rule in accordance with section 27 of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1027), prepare a substitute rule (see *Commonwealth Edison Co. v. Pollution Control Board* (1974), 25 Ill. App. 3d 271, 288, 323 N.E.2d 84, 96, *aff'd in relevant part* (1976), 62 Ill. 2d 494, 343 N.E.2d 459) or determine economic reasonableness on the basis of a newly repromulgated Rule 203. While the latter option allows the Board to continue its present practice regarding the evaluation of the economic reasonableness of Rule 202, we grant the option as such practice is not here challenged. We have not passed on its propriety, and this direction should not be construed as a sanction of the practice.

■■ As we have found the enactment of Rule 202 to be void, the Agency is precluded from denying the petition at bar because Celotex violated the rule. Under these circumstances, we no longer have a factual setting which frames the Agency's contention, made in conjunction with the first issue herein, that a rule violation allows a request for current information. We therefore do not reach that question.

The last of the three issues we today address is whether the permit was properly denied on the basis of alleged violations of Rules 203 and 204. The rules are set forth in *Commonwealth Edison Co. v. Pollution Control Board* (1974), 25 Ill. App. 3d 271, 285-86, 323 N.E.2d 84, 91-93, *aff'd in relevant part* (1976), 62 Ill. 2d 494, 343 N.E.2d 459.

The Agency does not contend that the permit was properly denied under the provisions of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1001 *et seq.*); indeed, it concedes the opposite. The Agency contends that it was required to deny the permit under the provisions of the clean Air Act (42 U.S.C.S. §7401 *et seq.* (1981 Supp.)). A brief examination of the history of this controversy is helpful to an understanding of this contention.

The Clean Air Act Amendments of 1970 "represented a drastic revision of earlier federal air quality standards." (*Appalachian Power Co. v. Environmental Protection Agency* (4th Cir. 1973), 477 F.2d 495, 497, cited in *Indiana & Michigan Electric Co. v. Environmental Protection Agency* (7th Cir. 1975), 509 F.2d 839, 841.) Then and when the Act was again amended in 1977, Congress recognized "that the prevention and control of air pollution at its source is the primary responsibility of the

States and local governments." (42 U.S.C.S, §7401 (3) (1981 Supp.).) To achieve this goal, each State was required to develop and submit to USEPA a State implementation plan (hereinafter SIP) which provided for the implementation, maintenance, and enforcement of national primary and secondary ambient air quality standards. (42 U.S.C.S. §7410(a) (1981 Supp.).) On April 30, 1971 the Administrator of USEPA promulgated the standards for six pollutants. (See *Friends of the Earth v. Carey* (2d Cir. 1977), 552 F.2d 25, 30.) Illinois developed and submitted its plan, which was approved by USEPA on May 31, 1972. (See *Illinois v. Commonwealth Edison Co.* (N.D. Ill. 1980), 490 F. Supp. 1145, 1151.) That approval was affirmed in *Indiana & Michigan Electric Co. v. Environmental Protection Agency* (7th Cir. 1975), 509 F. 2d 839, where the court held, *inter alia*:

"We hold, however, that a plan's technological feasibility and economic impact are not among the factors which the Administrator is obliged to consider under Section 110(a)(2), and that where a state's implementation plan satisfies the criteria set forth therein, the statute quite specifically requires the Administrator to approve it." *Indiana & Michigan Electric Co. v. Environmental Protection Agency* (7th Cir. 1975), 509 F. 2d 839, 844.

The significance of the court's holding is readily apparent when the language of section 27(a) of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1027(a)) is considered:

"In promulgating regulations under this Act, the Board shall take into account * * * the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution."

While the Federal challenge in *Indiana & Michigan Electric* failed, the State challenge of Rules 203 and 204 was successful as technical feasibility and economic reasonableness had not been taken into account. (*Commonwealth Edison Co. v. Pollution Control Board* (1974), 25 Ill. App. 3d 271, 323 N.E.2d 84, *aff'd in relevant part* (1976), 62 Ill. 2d 494, 343 N.E.2d 459.) As perceptively noted by a member of the Board, "[A]n interlocking mechanism ha[d] become unlocked." *Sherex Chemical Co. v. Environmental Protection Agency*, No. PCP 80—66, slip op. at 8 (P.C.B. Oct. 2, 1980) (concurring opinion).

Following the *Commonwealth Edision* decision, USEPA found the Illinois SIP to be deficient and requested a revision in accordance with Illinois law. (41 Fed. Reg. 32302 (Aug. 2, 1976).) On July 7, 1977, the Board issued an order "revalidating" the stricken rules. (See *Ashland Chemical Co. v. Pollution Control Board* (1978), 64 Ill. App. 3d 169, 175, 381 N.E.2d 56, 59.) Again the rules were challenged and again they were vacated. (*Ashland Chemical Co. v. Pollution Control Board*; *Illinois State Chamber of Commerce v. Pollution Control Board* (1978), 67 Ill. App. 3d 839, 384 N.E.2d 922, *appeal dismissed* (1979), 78 Ill. 2d 1, 398 N.E.2d 9.)

Again a notice of deficiency was issued. (44 Fed. Reg. 40723 (July 12, 1979).) At the time of oral argument, no rules had been repromulgated.

As stated prefatorily to the preceding history, the Agency contends that it was required to deny the permit under the provisions of the Clean Air Act (42 U.S.C.S 7401 *et seq.* (1981 Supp.)). It premises this contention on the grounds that, while the rules in question have been invalidated as provisions of Illinois law, they continue as viable provisions of the Illinois SIP. The Agency views its mandate as enforcing the SIP as part of Federal law.

The Agency buttresses its argument by pointing out there are a limited number of ways to revise an SIP and none have been here pursued. It directs our attention to a section 110(a)(3) (42 U.S.C.S. §7410 (a)(3) (1981 Supp.)) revision, a section 110(c) (42 U.S.C.S §7410(c) (1981 Supp.)) administrative revision, and the prohibitions of section 110(i) (42 U.S.C.S. §7410(i) (1981 Supp.)) in support of this theory. Without further detailing the Agency's argument, we note that it concludes the Illinois SIP has not been revised and that the rules in question remain enforceable as Federal law.

Whatever the merits of this argument may be, we decline to address them. We shall not be so presumptous as to suggest to USEPA and the Federal courts whether the SIP contains rules which are enforceable under Federal law.

That the rules are unenforceable in Illinois has been clearly established. As previously detailed, this is so because their technical feasibility and economic reasonableness have not been taken into account. These factors simply did not come into play when the SIP was approved, although the fact that they might in the then future was noted in *Indiana & Michigan Electric*:

> "In addition, petitioners have a right to challenge the reasonableness of state plans in the state courts, and as the respondent concedes, if 'part of a state implementation plan is held invalid by a state court, the state would have to revise that part. Should the state fail to do so, the Administrator must propose and promulgate a revision * * *. In either case, a hearing, or at least an opportunity for a hearing, is a prerequisite to adoption of the new regulation.' (respondents' brief, No. 72—1498).

> Finally, as previously noted, arguments concerning technology and economic impact may be presented to the Administrator prior to the date on which a compliance order issued pursuant to Section 113(a)(4) takes effect, and may be raised in the course of enforcement proceedings under Section 113(b)." (*Indiana & Michigan Electric Co. v. Environmental Protection Agency* (7th Cir. 1975), 509 F. 2d 839, 847.)

In a situation such as this, it would be anomalous to allow State enforcement of the SIP. Such a holding would permit the Agency to circumvent the rulings of the courts of Illinois by merely failing to revise the implementation plan. This we decline to do.

Interestingly, neither USEPA nor the Federal courts appear to quarrel with our holding. USEPA has twice issued notices of deficiency and has stated that as a result of previous decisions in our courts, the SIP does not contain validated rules for particulate or sulfur dioxide emissions (44 Fed. Reg. 40723 (July 12, 1979)). While the Federal courts are divided on the question of Federal enforceability of the SIP (compare *Illinois v. Celotex Corp.* No. 80—1225 (C.D. Ill., filed June 19, 1981), with *Illinois v. Commonwealth Edison Co.* (N.D. Ill. 1980), 490 F. Supp. 1145), the Federal view of State enforcement appears consonant with our holding herein:

> "Counsel for the state argues that we should remove the 'cloud' over state enforcement efforts caused by the notice. The decisions of the Supreme Court of Illinois create more than a 'cloud.' The decisions are an absolute bar to enforcement in the state courts until the mandate of the court in *Commonwealth Edison* is satisfied by the Pollution Control Board. The Notice of Deficiency only reflects the state court decision. The SIP by reason of the state court decisions cannot be enforced by the state in its own courts as contemplated by the Act. It appears that satisfying the Supreme Court of Illinois will also satisfy the Administrator of EPA.
>
> We do not see it to be our responsibility in the context of this case to try to supervise or instruct the Administrator or the State of Illinois about their respective responsibilities under the Act or the proper procedures to follow. The present quarrel seems to us to be a tempest of no consequence * * *."
>
> (*Illinois v. United States Environmental Protection Agency* (7th Cir. 1980), 621 F. 2d 259, 262.)

The rules in question are not enforceable in the courts of this State and will not be enforceable until that time the mandate of the courts of this State are heeded. The Celotex permit was therefore improperly denied on the basis of Rules 203 and 204.

Accordingly, the order of the Pollution Control Board affirming the denial of the permit at bar is reversed and this cause remanded to the Board for further proceedings in accordance with the views and directions herein.

Reversed and remanded with directions.

SCOTT, P. J., and ALLOY, J., concur.